56 A.3d 576

**Phillip Thane OLSON**

v.

**STATE of Maryland.**

**No. 3032, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Nov. 28, 2012.

312

314

316

Claudia A. Cortese (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Daniel J. Jawor (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: KRAUSER, C.J., WRIGHT and JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

JAMES A. KENNEY, III (Retired, Specially Assigned), J.

Appellant, Philip Thane Olson, was charged with multiple offenses arising out of incidents occurring on February 14, March 6,[1] and May 12, 2009. On January 14, 2010, a jury sitting in the Circuit Court for Washington County convicted appellant of two counts of keeping a disorderly house (February 14, May 12), two counts of disorderly conduct (March 6, May 12), two counts of failure to obey a lawful order of a police officer (March 6, May 12), and one count each of disturbing the peace (May 12) and resisting arrest (May 12). He was sentenced to three years imprisonment for resisting arrest, a concurrent six month sentence for keeping a disorderly house, and three consecutive 60–day sentences for disorderly conduct and for disturbing the peace. In his timely appeal, appellant presents the following questions for our review, which we have revised as follows:

1. Was there sufficient evidence to support appellant's conviction for resisting arrest on May 12?

2. Did the trial court commit plain error in its jury instruction on resisting arrest?

3. Was there sufficient evidence to support appellant's convictions for keeping a disorderly house on February 14 and May 12?

4. Did the trial court err in its jury instruction on keeping a disorderly house?

For the reasons set forth below, we answer the first question in the affirmative and second and third questions in the negative. Having answered the third question in the negative, we do not address the fourth question.

---

1. The facts of March 6, 2009 are not pertinent to this appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant's apartment, located at 417 South Potomac Street in Hagerstown, Maryland, is directly above the apartment of Michelle and Larry Straitiff. On February 14, 2009, the Straitiffs returned home from work around 5:00 p.m. Mrs. Straitiff testified, "as soon as we walked in the door, the music upstairs at [appellant's] apartment went up so loud that we couldn't even hear a conversation between ourselves." Mr. Straitiff testified that appellant "turned up the music real loud, started jumping up and down on the floor up above us.... I could hear it clean out on the front street." After an hour of the noise, Mrs. Straitiff called the police.

Officers R.D. Isaacs and Dwayne White from the Hagerstown City Police Department responded to the call. Officer Isaacs, who arrived first, testified that he was able to hear "loud music or the tv" when he entered the apartment building, and from inside the Straitiffs apartment he could hear that "the tv was loud and [appellant] was stomping, yelling and using profanity." The officers went to appellant's apartment and Officer White "advised [appellant] why we were there, if I had to come back he was going to get issued a citation for disorderly household," and Officer Isaacs "advised him that he needed to turn his music down and keep the noise under control." Officer White told the Straitiffs to call if the noise returned.

Mrs. Straitiff testified that as soon as the officers left, "the music went back up again ... as loud as it was before" and there was "yelling and stomping and things like that." She called the police and, approximately fifteen minutes after leaving, Officers White and Isaacs returned to the location. Officer White testified that from the first floor of the apartment building he could hear music and "was able to hear the yelling and the television on and the stomping on the floor" from inside the Straitiffs' apartment. He specified that "it was all just a lot of yelling" and "possibly some cursing." Officer Isaacs testified that he could hear the noise from outside the apartment building.

The officers went to appellant's apartment and "had to bang on the door" for "a couple of minutes" before appellant opened the door. According to Officer Isaacs, "we entered his apartment and we advised him that he needed to turn his music down ... or actually it was the television. And he kept ranting and raving that ... his music is not loud and he wasn't cussing or doing anything wrong." The officers entered the apartment, turned down the music, issued a citation for maintaining a disorderly house, and then left.

According to Officer White, "approximately at 7:57 p.m." he and Officer Isaacs were "dispatched there again for the same type of complaint coming from the third floor." Officer White could hear the noise both from the common area of the apartment building and from inside the Straitiffs' apartment. The officers began "banging" on appellant's door, and, although at first "he didn't answer," he later "stood on the other side of the door and was talking to us." According to Officer Isaacs, they "were just advising him he needs to turn it down and he just refused." Officer White testified that he did not arrest appellant at this time because that would have required "kick[ing] his door in[.]" Officer White testified that "since he would not answer the door, I went back" to the police station "and filed for a criminal summons" for keeping a disorderly house.

Mrs. Straitiff testified that, on May 12, 2009 at approximately 11:00 p.m., it was

> the same thing all over again.... [T]he music was always so loud that I could not watch the tv. I couldn't enjoy ... I couldn't talk on the phone. I couldn't have a conversation with anyone in my home.... This day it was really pronounced, again, the stomping, the screaming, the yelling.... Always profanity. Always bitch, whore, slut, crack whore.

At approximately 1:00 a.m. the Straitiffs called the police. Officer Langley Dean, who, with Officer Jesse Duffey, responded to the call, testified that "[a]s soon as I got out of my patrol car I could hear loud music coming from the area," and

from inside the Straitiffs' apartment "[y]ou could hear loud music and you could hear some thumping on ... the floor." Officer Duffey testified that he could hear the music from the street when they parked the vehicle, and that "it's a heavy [sic] populated area with apartments and houses all down that street[.]"

When Officer Dean knocked on appellant's door and asked appellant "to open up so we could talk," appellant yelled through the door, "Fuck you, you're the police. Motherfucker.... Fuck you, I am playing the music all night and Hagerstown City Police, I am recording you." Officer Dean went to the back window of appellant's apartment, knocked on it and looked into the apartment. According to the officer, appellant came

> to the window, opened the blind up. I can clearly see him inside the apartment. Ah, he was holding a laser level. Ah, the beam was protruding from the laser level and he was stating that that was his tape recorder and that he was recording everything that we were doing and what we were saying to him.

According to Officer Dean, "the whole reason we were there [was] to get [appellant] to turn the music down," and he specifically asked appellant to turn down the music. In response, appellant "stated that he was going to play his music all night long. Ah, just kept screaming and yelling and wouldn't let us in, wouldn't come out to talk to us." Officer Dean testified that appellant would at times turn down the music, but "[o]nly to scream more profanities" and then "[h]e would turn his music back up."

Officer Dean called his supervisor, Sergeant David Long, to "make him aware of the situation." Sergeant Long arrived and attempted to speak with appellant, who yelled profanities at Sergeant Long through his door "loud enough for anybody ... in the apartment building to hear." According to Officer Dean,

> [w]e made every effort that we could ... to get the music turned down. We ... had dispatch attempt to call the

landlord so we could gain access.... [A]t times when we couldn't get him to come to the door, or couldn't get him to come to the window, we tapped on the air conditioner, trying to get his attention.

[W]e even made the attempt to have a deputy sent out to ... the landlord's house ... [a]nd was unable to get an answer at the door.

According to Officer Dean, after about an hour, "Sergeant Long made the decision that we were going to make entry and take [appellant] into custody."[2] Sergeant Long justified his decision based on the fact that appellant "was continually causing a disturbance in an apartment building after numerous requests for him to turn down his music, to quiet down ... and he just completely refused." According to Sergeant Long:

We were trying to make every attempt ... to get him to calm down. We attempted to bring his level of agitation down. Actually at one point had the officers who were parked out front, told them to move their cruisers out of sight so that if he ... saw the cruisers out front and that was irritating him or whatever was agitating him, to try to defuse that as much as we could.

Ah, and that was to no avail. Ah, we made phone calls into his residence on the phone. [H]e would either not answer the phone or he would be very belligerent on the phone. We actually had [Mrs. Straitiff] come up to try to talk to him, to reason with him and that was to no avail.

Officer Dean testified that appellant was advised "that we were coming in. If he didn't open the door, we were coming in after him," and that "he was going to be placed under arrest." Appellant refused to open the door, and responded, "You cannot come into my house." Meanwhile, according to Officer Dean, appellant had been seen from the back window

---

**2.** Sergeant Long testified that it could "possibly" have taken more than 90 minutes to obtain a warrant.

by another officer and the police had information that appellant was washing knives and could easily grab them.[3]

When the order to enter appellant's apartment was given, the Fire Department "popped the door" using a hydraulic hand tool. Officer Dean testified:

when the door popped open, I'd say [appellant] was approximately ten feet away from us and as soon as the door popped, he immediately turned, both hands up in the air, charging at the officers going through the door.

Officer Jesse Duffey testified that appellant approached the officers "with his hands raised and appeared to be in an aggressive manner as if he was going to punch them or wrestle with [them]," and Sergeant Long testified:

as soon as we entered the door, [appellant] immediately turned at us and came running at us with this hands . . . in a clenched position. I couldn't tell if he had anything in his hands or . . . at that point but [he was] obviously agitated because we had entered through the door.

According to Officer David Rizer, who was the first officer to enter, appellant "spun around from the kitchen sink, had both hands in the air and was charging in my direction." Officer Rizer fired his taser and appellant fell backwards.

The State rested and appellant moved for judgment of acquittal. For keeping a disorderly house, appellant argued that: (1) the citations he received on February 14, 2009 were "duplicitous" because keeping a disorderly house is an offense predicated on a "reoccurring event;" (2) noise alone was insufficient to support the February 14, 2009 and May 12, 2009 charges; and (3) keeping a disorderly house requires offenses by "multiple people."

As to resisting arrest, appellant argued:

Arrest isn't that I'm moving towards you and I'm going to taze you. Even if I say, "Oh, you're under arrest." That's

---

**3.** Officer Duffey testified that from the outside window he observed appellant "pulling out knives and washing, cleaning the knives," and "yelling obscenities at us."

not arrest. I actually have to put him physically under arrest or begin to touch him under arrest.

And, so if you look at that it says the offense requires proof that he intentionally made physical contact or he attempted to break lose of that contact. That didn't occur. There's no testimony at all that my client at any point was detained. He was just tazed because he made movement toward the door.

Appellant also argued that, because there were no exceptions to the warrant requirement to support the police entering his home warrantlessly, he was justified in resisting arrest:

I'm also arguing, in the alternative is that because it was a warrant-less arrest and on a warrant-less arrest that was no consensual entry into the home. . . . So, if we have non-consensual warrant-less entry into the home, even though the testimony of Sergeant Long was there . . . the warrant could have been attained. Now there was the discrepancy on how long it would have taken to be obtained, but it could have been obtained from the Commissioner's Office, which was, you know, two to three minutes away, that was open.

Now, with no warrant and no consent to enter then we have to look at two things. There was the exigent circumstances and then there's the caretaker exception. Caretaker exception I can dismiss in the sense that a caretaker exception, there's a fire; I'm going to enter in to help the (inaudible). That does not apply.

Exigent circumstances does not apply, as well. . . . Once again, exigent circumstances has generally been defined as, "We're going in to maintain that there's evidence there that may be destroyed before we get the search warrant." Now, my client was in there for an hour and a half. There was no . . . there's no . . . none of his charges deal with the destruction of evidence. There was no exigent circumstance to enter into the home.

Noise has never been . . . said to be an exigent circumstance that we need to enter. Now, I understand that they probably were annoyed and they wanted to . . . to terminate

this call and perhaps . . . allow the community some silence. However, as stated by every officer, there was no one that was allegedly complaining about this except for [Mrs.] Straitiff. So, at this point there simply is no exigent circumstances. They should have went and got a warrant. They didn't.

Now, under the case law it also says that if they do not get a warrant and they enter into [appellant's] home he is lawfully in his right to resist that arrest. Because now it's an unlawful arrest.

The court ruled:

There is some . . . case law, cause right, the disorderly house talks about bawdy houses and houses of gambling, houses where immoral people get together and do immoral things.

Ah, and at first, some of the definitions seem to indicate that it requires individuals, for instance, you people who are gambling or . . . engaging in bawdy house activities would be multiple persons. But there's other instances where just . . . it talks about multiple acts as opposed to multiple people.

. . . Now what I imagine . . . a nuisance house requires . . . is something habitual. Ah, and I don't know that one instance can be habitual. I think habitual requires at least two instances and for that reasons the motion for judgment of acquittal is granted as to the citation which was issued . . . on February fourteenth. . . . A motion of judgment of acquittal is granted as to that charge because that was the first instance and I don't think it was habitual at that point.

Later that day . . . Officer White seeks an application for a statement of charges. . . . The motion for judgment of acquittal is denied as to that count.

And also its denied as to the count of disorderly house . . . which allegedly occurred on May twelfth.

* * *

I believe that resisting arrest requires the use of force but I never thought it required physical contact. The testimony

construed in a light most favorable to the State at this point, ah, particularly that of several of the police officers, including Sergeant Long ... was that [appellant] was told repeatedly that he was arrested, that he would be, ah, arrested, that he should get on the ground, I think the testimony was and instead of submitting to that [appellant] forcefully approached and the word charged was used, the word walked was used, but in all instances the testimony was that [appellant] had his hands up in ... an aggressive manner.

That's a question for the jury I believe whether or not [appellant] used force to resist arrest.

* * *

[T]he police had spent and again, in a light most favorable to the State at this juncture ... an hour, at least, and an hour and a half by some testimony, ah, making reasonable efforts to ... abate this ... problem. Ah, trying to get a hold of the landlord. The landlord wouldn't answer his phone, wouldn't answer his door when a deputy was dispatched out there. Ah, knocking on windows, knocking doors, sending, apparently poor Mrs. Straitiff up to try to reason with [appellant] herself. All of those instances had been unsuccessful and an hour had gone by.

Sergeant Long testified, yeah, they could have gone to the Commissioner's Office and filled out some paperwork and tried to get a warrant, which it's reasonable to assume that another significant amount of time would go by.

The Fourth Amendment protects individuals from unreasonable, ah, searches and seizures. And certainly I find the ... Fourth Amendment fully applies to ... [appellant's] apartment. It's his residence and the Fourth Amendment gives him rights of privacy in there and rights to be ... protected from unreasonable searches and seizures.

In this instance, I'm ruling that what the police did that evening after an hour and a half, considering the extreme disturbance ... to the neighborhood. Now albeit there's evidence one person complained, but there's evidence other individuals were ... clearly within earshot and this was as

[appellant's counsel] even argued a densely packed residential area. It was reasonable for the police to take reasonable efforts to try to ... abate this problem. And the only option after the landlord wouldn't help and [appellant] wouldn't answer the door considering his ... obvious refusal to cooperate with the police at that point, ... I find that Sergeant Long made a reasonable decision ... to use the minimal amount of force and damage necessary to abate this nuisance. And [appellant] was informed that he was under arrest and they yelled that in at him.

[Appellant] knew that the police were coming when he heard the door pop. [Appellant] made aggressive movements towards the door. The police used reasonable force at that point to protect themselves. Officer Rizer said he didn't have the opportunity to see clearly what was in [appellant's] hand or what wasn't in [appellant's] hand. But he knew from Officer Duffey [that appellant] had been washing at least one knife, if not knives.

Therefore, I believe that Sergeant Long's actions that night were reasonable. This was a reasonable ... entry which is not in contravention of the Fourth Amendment.

Appellant requested, *inter alia,* the following jury instructions:

In order to convict [appellant] of Resisting Arrest, the State must prove:

(1) that [appellant] was arrested;

(2) that the arrest was lawful; and

(3) that [appellant] refused to submit to that arrest.

* * *

In order to convict [appellant] of Disorderly House, the State must prove:

(1) that [appellant] kept a house as a place of habitual or common resort of people of evil name and fame, and of dishonest conversation;

(2) that [appellant] kept the house for these people to consort together affording opportunities for and tempta-

tions to the indulgence of their bad habits and passions; and

(3) that the keeping of the house was to the evil example and scandal of the neighborhood.

The court instructed the jury, in pertinent part:

In order to convict [appellant] of resisting arrest, the State must prove that [appellant] was arrested; that the arrest was lawful; that [appellant] refused to submit to that arrest.

\* \* \*

[I]n order to convict [appellant] of keeping a disorderly house the State must prove that [appellant] was keeping a place where acts prohibited by statute are habitually indulged or permitted. A person is keeping a disorderly house if it is kept as a place where acts prohibited by statute are habitually indulged or permitted.

After instructing the jury, the court asked counsel if there were "any additional requests for jury instructions or objections to the instructions as indicated other than what's already on the record?" Both the State and appellant's counsel responded in the negative.

Appellant was convicted of resisting arrest, failure to obey the orders of a police officer, disorderly conduct, keeping a disorderly house, and disturbing the peace.

## DISCUSSION

### Standard of Review

### Sufficiency of the Evidence

In *Moye v. State,* 369 Md. 2, 796 A.2d 821 (2002), the Court of Appeals explained:

The standard of review for appellate review of evidentiary sufficiency is whether any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. We view the evidence in the light most favorable to the prosecution. We give "due regard to the [fact finder's] finding of facts, its resolution of conflicting evi-

dence, and, significantly, its opportunity to observe and assess the credibility of witnesses." Although our analysis does not involve a re-weighing of the evidence, we must determine whether the ... verdict was supported by either direct or circumstantial evidence by which any rational trier of fact could find [the defendant] guilty beyond a reasonable doubt of the ... charges.

*Id.* at 12–13, 796 A.2d 821 (internal citations omitted). "The limited question before us, therefore, is not whether the evidence *should have* or *probably would have* persuaded the majority of fact finders but only whether it *possibly could have* persuaded any rational fact finder." *Fraidin v. State,* 85 Md.App. 231, 241, 583 A.2d 1065 (1991).

### *Jury Instruction Error*

In *Smith v. State,* 403 Md. 659, 663–64, 944 A.2d 505 (2008), the Court of Appeals stated:

"We have held that the standard of review for jury instructions is that so long as the law is fairly covered by the jury instructions, reviewing courts should not disturb them." *Farley v. Allstate Ins. Co.,* 355 Md. 34, 46, 733 A.2d 1014, 1020 (1999) (citing *Jacobson v. Julian,* 246 Md. 549, 561, 229 A.2d 108, 116 (1967)). *See also Boone v. American Mfrs. Mut. Ins. Co.,* 150 Md.App. 201, 227, 819 A.2d 1099, 1113 (2003). If, however, the instructions are "ambiguous, misleading or confusing" to jurors, those instructions will result in reversal and a remand for a new trial. *See Battle v. State,* 287 Md. 675, 684–85, 414 A.2d 1266, 1271 (1980) (quoting *Midgett v. State,* 216 Md. 26, 41, 139 A.2d 209, 217 (1958)). On the other hand, the instructions must be read in context. "The charge to the jury must be considered as a whole and the Court will not condemn a charge because of the way in which it is expressed or because an isolated part of it does not seem to do justice to one side or the other." *Morris v. Christopher,* 255 Md. 372, 378, 258 A.2d 172, 176 (1969) (citing *Nora Cloney & Co. v. Pistorio,* 251 Md. 511, 515, 248 A.2d 94, 96 (1968)).

*Resisting Arrest*

*Sufficiency of the Evidence*

Appellant was charged with the common law crime of resisting arrest.[4] Recognizing some confusion in the case law, we recently clarified that, in order for a defendant to be found guilty of resisting arrest, the State must prove:

(1) that a law enforcement officer arrested or attempted to arrest the defendant;

(2) that the officer had probable cause to believe that the defendant had committed a crime, *i.e.*, that the arrest was lawful; and

(3) that the defendant refused to submit to the arrest and resists by force or threat of force.

*See Rich v. State*, 205 Md.App. 227, 239–60, 44 A.3d 1063 (2012).

Here, focusing on the first and second elements,[5] appellant argues that the evidence was insufficient to support his conviction:

---

4. The statutory version of the crime, found in § 9–408 of the Criminal Law Article ("Resisting or interfering with arrest."), states, in pertinent part:

 (b) *Prohibited.*—A person may not intentionally:
 (1) resist a lawful arrest; or
 (2) interfere with an individual who the person has reason to know is a police officer who is making or attempting to make a lawful arrest or detention of another person.
 (c) *Penalty.*—A person who violates this section is guilty of a misdemeanor and is subject to imprisonment not exceeding 3 years or a fine not exceeding $5,000 or both.
 (d) *Unit of prosecution.*—The unit of prosecution for a violation of this section is based on the arrest or detention regardless of the number of police officers involved in the arrest or detention.

 Though codified in 2004, the elements of resisting arrest remain defined by the common law. *Rich v. State*, 205 Md.App. 227, 239, 44 A.3d 1063 (2012).

5. We understand appellant's statement, "[t]he court accepted as fact that when [appellant] turned from the sink, put his dukes up and was 'charging' the police—*completing all of the acts on which the 'resisting' was based,*" as conceding that the third element of resisting arrest, *i.e.,*

- "First, the evidence did not establish that [appellant] was under arrest when he 'charged' toward the police but did not touch them as the officers entered his apartment and tasered him from five to six feet away.... [A]n arrest in not effected by a mere statement like 'You're under arrest.' ... It is clear ... that the court found as a matter of fact that the police had only announced their intention to arrest [appellant] and had not physically touched him in any way when [he] 'charged' at the officers who were bashing in his apartment door. The court accepted as fact that when [appellant] turned from the sink, put his dukes up and was 'charging' the police— completing all of the acts on which the 'resisting' was based—the police had not seized him, laid a hand on him, grabbed him or touched him in any manner. It was only *after* he had charged the officers that [appellant] was physically touched, grabbed or subdued, here by being tasered."

- "Second, the entry into [appellant's] home to effect this warrantless arrest was not justified by exigent circumstances as required by law and hence [appellant] was justified in resisting any such arrest.... No one in [appellant's] apartment was injured. There was no evidence being destroyed. There was no felony being committed.... There was nothing preventing the officer from taking any part of the over an hour and a half that they waited at the scene to go to the court house only 5 minutes away and obtain an arrest warrant. All the police had here was noise. Noise is not an exigent circumstance authorizing forcible warrantless entry into a person's home."

The State responds:

- "Although the officers had not yet laid hands on [appellant] when he charged at them, they had surrounded his ... apartment before entering.... Officers were sta-

resistance "by force or threat of force," was satisfied. (Emphasis added).

tioned on the publicly accessible back fire escape and spoke to [appellant] through his back window. Additional officers were stationed at [appellant's] apartment front door and conversed with him through it. During this time, moreover, the police informed [appellant] he was under arrest. Under the circumstances, [appellant's] freedom of movement was limited to his ... apartment, which he could not leave. The officer's conduct therefore constituted an act that indicated an intention to take appellant into custody that subjected him to the actual control and will of the arrest[ing] officers."

- "[Appellant] also argues that he was privileged to resist his arrest because, without an arrest warrant, the officers' entry into the home made the arrest unlawful. But, when it comes to the offense of resisting a *warrantless* arrest, the lawfulness of the arrest is not assessed against the absence of the warrant—for that is assumed—but rather against the existence of probable cause. [Appellant] cites no Maryland case, and the State's research reveals none, that assesses the lawfulness of the warrantless arrest based on the manner of the arrest's effectuation rather than its justification at inception. And, indeed, when it comes to the arrest's lawfulness, the pattern jury instruction refers to the State's burden to prove only probable cause."

■ To satisfy the first element of resisting arrest, a law enforcement officer must "arrest[ ] or *attempt* [ ] *to arrest* the defendant." (Emphasis added).[6] The Court of Appeals has said:

It is generally recognized that an arrest is the taking, seizing, or detaining of the person of another (1) by touching or putting hands on him; (2) or by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest;

---

**6.** Maryland Criminal Pattern Jury Instructions 4:27.1 ("Resisting Arrest (Warrantless)") requires "that a law enforcement officer attempted to arrest the defendant[.]"

or (3) by the consent of the person to be arrested. It is said that four elements must ordinarily coalesce to constitute a legal arrest: (1) an intent to arrest; (2) under a real or pretended authority; (3) accompanied by a seizure or detention of the person; and (4) which is understood by the person arrested.

We have defined an arrest in general terms as the detention of a known or suspected offender for the purpose of prosecuting him for a crime. Our cases make clear ... that in ordinary circumstances "there is a detention only when there is a touching by the arrestor or when the arrestee is told that he is under arrest and submits [but][w]here there is no touching, the intention of the arrestor and the understanding of the arrestee are determinative, for in order for there to be an arrest in such case, there must always be an intent on the part of one to arrest the other and an intent on the part of such other to submit." Ordinarily, therefore, there can be no arrest where there is no restraint or where the person sought to be arrested is not conscious of any restraint. At least one court has concluded that an unconscious person cannot be subjected to a valid arrest. But, as indicated in Fisher, Laws of Arrest, chapter IV, at 52 (1967), it is only where there is no actual manual seizure of the arrested person that his intention or understanding assumes controlling importance.

*Belote v. State*, 411 Md. 104, 114–15, 981 A.2d 1247 (2009) (quoting *Bouldin v. State*, 276 Md. 511, 515–16, 350 A.2d 130 (1976)).

 Here, we are persuaded that appellant clearly understood that he was in the process of being arrested when he "charged" at the officers. The officers testified that they repeatedly asked appellant to reduce the noise, and that he repeatedly refused to comply. Officer Dean testified that the officers "advised [appellant] that we were coming in. If he didn't open the door, we were coming in after him," and that "he was going to be placed under arrest." Although appellant had not been "touched" by the officers before he charged them, he clearly would have been in the absence of his

submitting to the arrest. That appellant understood that he was being arrested is reflected by the repeated warnings and his charging the officers when they entered. This, in our view, constitutes an *attempted* arrest that was completed when he was tased.

The second element of resisting arrest is "that the officer had probable cause to believe that the defendant had committed a crime, *i.e.*, that the arrest was lawful[.]" *Rich,* 205 Md.App. at 240, 44 A.3d 1063. *See also* Maryland Criminal Pattern Jury Instructions 4:27.1 ("Resisting Arrest (Warrantless)" requires "that the officer had reasonable grounds to believe that the defendant [was committing] [had committed] (crime)[.]").

The Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), includes "two separate clauses, the first protecting the basic right to be free from unreasonable searches and seizures and the second requiring that warrants be particular and supported by probable cause." *Payton v. New York,* 445 U.S. 573, 584, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). It states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend IV.

"The touchstone of the Fourth Amendment is reasonableness[.]" *United States v. Knights,* 534 U.S. 112, 118, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). With this in mind, the Supreme Court has consistently affirmed that searches and seizures "conducted outside the judicial process," *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), *i.e.,* without "a judicial warrant . . . issued by a neutral magistrate after finding probable cause," *United States v. Place,* 462 U.S. 696, 701, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983),

both "are presumptively unreasonable," *Payton,* 445 U.S. at 586, 100 S.Ct. 1371, or *"per se* unreasonable under the Fourth Amendment[.]" *Katz,* 389 U.S. at 357, 88 S.Ct. 507.[7] This "traditional view" of the Fourth Amendment, Debra Livingston, *Police, Community Caretaking, and the Fourth* Amendment, 1998 U Chi Legal F 261, 262 (1998), has been applied equally to searches and seizures, occurring both inside and outside of the home. *See Payton,* 445 U.S. at 585–88, 100 S.Ct. 1371; *see also United States v. Watson,* 423 U.S. 411, 429, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) ("Logic would seem to dictate that arrests be subject to the warrant requirement to at least the same extent as searches.") (Powell, J., concurring).

 The warrant requirement is "subject . . . to a few specifically established and well-delineated exceptions." *Katz,* 389 U.S. at 357, 88 S.Ct. 507. In general, a police officer "possesses legal justification 'to make a warrantless arrest where he has probable cause to believe that a felony has been committed, and that the arrestee perpetrated the offense.'" *Prince George's County v. Longtin,* 419 Md. 450, 506 (2011) (quoting *Ashton v. Brown,* 339 Md. 70, 120, 660 A.2d 447 (1995)) (emphasis removed).[8] A warrantless invasion *of a*

---

**7.** Warrantless searches are *per se* unreasonable "only in the sense that the police must secure a warrant unless they can demonstrate that the case fits within one of a number of specific exceptions that the Court has fashioned." Debra Livingston, *Police, Community Caretaking, and the Fourth Amendment,* 1998 U Chi Legal F 261, 267 (1998).

**8.** Section 2–202 of the Criminal Law Article ("Warrantless arrests—In general.") states:

(a) *Crimes committed in presence of police officer.*—A police officer may arrest without a warrant a person who commits or attempts to commit a felony or misdemeanor in the presence or within the view of the police officer.

(b) *Probable cause to believe crime committed in presence of officer.*—A police officer who has probable cause to believe that a felony or misdemeanor is being committed in the presence or within the view of the police officer may arrest without a warrant any person whom the police officer reasonably believes to have committed the crime.

(c) *Probable cause to believe felony committed.*—A police officer without a warrant may arrest a person if the police officer has probable

*residence,* however, "imposes additional requirements," because "[a] man in his own home has a right of privacy which he does not have when on the public street." *Accarino v. United States,* 179 F.2d 456, 464 (D.C.Cir.1949).[9] Thus, "[i]n general a home may not be searched without a warrant notwithstanding probable cause." *Dorman v. United States,* 435 F.2d 385, 389 (D.C.Cir.1970).

In considering and tailoring the exceptions to the warrant requirement for a home invasion to search or effect a seizure, and recognizing that "what is reasonable depends on the context" surrounding such an invasion, *New Jersey v. T.L.O.,* 469 U.S. 325, 337, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), the Court of Appeals has observed that, "[i]n essence police officers function in one of two roles: (1) apprehension of criminals (investigative function); and (2) protecting the public and rescuing those in distress (caretaking function)." *Stanberry v. State,* 343 Md. 720, 743, 684 A.2d 823 (1996) (quoting *State v. Carlson,* 548 N.W.2d 138, 141 (Iowa 1996)).

The leading exception to the warrant requirement for home invasions to execute a search or seizure is the presence of "exigent circumstances." *See Payton,* 445 U.S. at

---

cause to believe that a felony has been committed or attempted and the person has committed or attempted to commit the felony whether or not in the presence or within the view of the police officer. In *Dunnuck v. State,* 367 Md. 198, 208, 786 A.2d 695 (2001), the Court of Appeals stated that,

[p]ursuant to this statute, an officer who witnesses the commission of a felony or misdemeanor, or who simply has probable cause that a felony or misdemeanor is being committed in his or her presence, may arrest the perpetrator or suspected perpetrator, without the necessity of obtaining a warrant.

The application of § 2–202 has been limited to "[o]utside the home[.]" *Faulkner v. State,* 156 Md.App. 615, 641, 847 A.2d 1216 (2004).

9. It is well-established that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *United States v. United States Dist. Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), and, thus, "the right of officers to thrust themselves into a home is … a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance." *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

590, 100 S.Ct. 1371 ("Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.").[10] The exigent circumstances exception "is to be construed narrowly," *Stackhouse v. State,* 298 Md. 203, 215–16, 468 A.2d 333 (1983), and the Court has stated that "[t]he meaning of exigency implies urgency, immediacy, and compelling need." *Id.* at 212, 468 A.2d 333.

> In *Wengert,* the Court of Appeals observed that
> [t]he Supreme Court has recognized that a warrantless search and seizure does not violate the Fourth Amendment when law enforcement officers are faced with exigent circumstances such that there is a "compelling need for official action and no time to secure a warrant." *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978) (burning building). *See Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) (emergency aid); *United States v. Santana,* 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–10, 49 L.Ed.2d 300 (1976) (hot pursuit); *Warden v. Hayden,* 387 U.S. 294, 298, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967) (hot pursuit and danger to human life); *Schmerber v. California,* 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966) (imminent destruction of evanescent evidence); *Ker v. California,* 374 U.S. 23, 37–41, 83 S.Ct. 1623, 1632–34, 10 L.Ed.2d 726 (1963) (destruction of evidence).

364 Md. at 85, 771 A.2d 389. Of these examples of exigent circumstances, " 'hot pursuit' and destruction or removal of evidence" represent the "two principal categories of cases[.]" *Stackhouse,* 298 Md. at 213, 468 A.2d 333.

An exigent circumstances analysis is done on a "case by case basis." *Williams v. State,* 372 Md. 386, 403, 813 A.2d 231 (2002). Analytically, "the opportunity of the police to have obtained a warrant prior to invading the residence to

---

**10.** If exigent circumstances justify the entry, "[t]he scope of the search must [also] be strictly tied to and justified by the circumstances that rendered its initiation permissible." *Wengert v. State,* 364 Md. 76, 86, 771 A.2d 389 (2001).

make the warrantless arrest, is a highly relevant factor" that is "critical[.]" *Smith v. State,* 72 Md.App. 450, 464, 531 A.2d 302 (1987) (Where police had two hours between having probable cause to arrest and a warrantless arrest in the home, there were no exigent circumstances). "[T]hat the suspect is reasonably believed to be armed" is another "consideration [which] bears materially on the justification for a warrantless entry," because "[d]elay in arrest of an armed felon may well increase danger to the community . . . or to the officers at time of arrest." *Dorman v. United States,* 435 F.2d 385, 392 (D.C.Cir.1970). The observation by the police of a perpetrator "actively engaged" in the commission of a crime contributes to a finding of exigency,[11] but "the nature of the offense, its seriousness and the ease with which the evidence can be disposed of" are also factors to be weighed. *Dunnuck v. State,* 367 Md. 198, 217, 786 A.2d 695 (2001).

■■■ Courts, including Maryland courts, also "have carved out [an] exception to the Fourth Amendment's prohibition against warrantless searches . . . based on the so-called 'com-

---

11. This factor, as described in *Dunnuck v. State,* 367 Md. 198, 786 A.2d 695 (2001), comes from *Griffin v. State,* 200 Md. 569, 92 A.2d 743 (1952), in which the Court of Appeals held "that it is lawful for a police officer without a warrant to enter and search a dwelling when he can see from the outside that a crime is being committed inside." *Id.* at 574, 92 A.2d 743 (citing *Agnello v. United States,* 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925); *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948)); *see also McBride v. United States,* 284 F. 416, 419 (5th Cir.1922) ("At common law it was always lawful to arrest a person without a warrant, where a crime was being committed in the presence of an officer and to enter a building without a warrant, in which such crime was being perpetrated."); 3 Wayne R. LaFave, A Treatise on the Fourth Amendment, § 6.1(1), p. 262–63 (4th ed. 2004) ("If the police do not have a warrant and the offense is a misdemeanor, in many jurisdictions it is necessary that the offense have occurred in the officer's presence" if the police enter "private premises for the purpose of making [the] arrest."). But the *Dunnuck* Court, noting that *Griffin* was decided before the Fourth Amendment was applicable to the states and that *Agnello* and *Johnson* do "not stand[ ] for the proposition for which they were cited," 367 Md. at 216–17, 786 A.2d 695, stated that *Griffin* "does not control the decision in this case and, in any event, to the extent that it is inconsistent with our decision today, it is overruled." *Id.* at 216, 786 A.2d 695.

munity caretaking functions' of police officers." *United States v. McGough*, 412 F.3d 1232, 1237 (11th Cir.2005). More specifically, "[w]hen the police cross a threshold not in their criminal investigatory capacity but as part of their community caretaking function," *State v. Alexander*, 124 Md.App. 258, 276–77, 721 A.2d 275 (1998) (footnote omitted), "the traditional constitutional requirements involving a warrant, probable cause, and the like" ordinarily "have no operable effect. . . ." John F. Decker, *Emergency Circumstances, Police Responses, and Fourth Amendment Restrictions*, 89 J.Crim. L. & Criminology 433, 446 (1999) (citing *South Dakota v. Opperman*, 428 U.S. 364, 370 n. 5, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976)).

"[W]hile related to" the exigent circumstances exception and sometimes "used interchangeably" with that exception, it has been stated that the community caretaking doctrine should be considered a "separate exception[ ]," *State v. Kaltner*, 420 N.J.Super. 524, 540, 22 A.3d 77 (2011) (citation omitted), and as "a species apart" from the exigent circumstances exception used in analyzing an occurrence involving ordinary law enforcement activities. Debra Livingston, *Police, Community Caretaking, and the Fourth Amendment*, 1998 U Chi Legal F 261, 277 (1998).

The community caretaking doctrine was explicated by the Supreme Court in the context of motor vehicles:

Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle, can become disabled or involved in an accident on public highways, the extent of police-citizens contact involving automobiles, will be substantially greater than police-citizen contact in a home or office. Some such contact will occur because the officer may believe the operator has violated a criminal statute; but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as *community caretaking functions, totally divorced from the detection, investigation,*

*or acquisition of evidence relating to the violation of a criminal statute.*

*Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (emphasis added).

■ The doctrine "embraces an open-ended variety of [police] duties and obligations that are not directly involved with the investigation of crime," *State v. Brooks,* 148 Md.App. 374, 383, 812 A.2d 342 (2002), but which are necessary to:

reduce the opportunities for the commission of some crimes through preventative patrol and other measures, aid individuals who are in danger of physical harm, assist those who cannot care for themselves, resolve conflict, create and maintain a feeling of security in the community, and provide other services on an emergency basis.

*Alexander,* 124 Md.App. at 267, 721 A.2d 275 (quoting 3 Wayne R. LaFave, A Treatise on the Fourth Amendment, § 6.6, p. 390 (3d ed.1996)). As one writer has observed:

Communities have always looked to local police to perform social services unrelated or at best partially related to enforcing criminal law. "Community caretaking" denotes a wide range of everyday police activities undertaken to aid those in danger of physical harm, to preserve property, or "to create and maintain a feeling of security in the community." It includes things like the mediation of noise disputes, the response to complaints about stray and injured animals, and the provision of assistance to the ill or injured. Police must frequently "care for those who cannot care for themselves: the destitute, the inebriated, the addicted . . . and the very young." They are often charged with taking lost property into their possession; they not infrequently see to the removal of abandoned property. In those places where social disorganization is at its highest, police are even called upon "to serve as surrogate parent or other relative, and to fill in for social workers, housing inspectors, attorneys, physicians, and psychiatrists." Community caretaking, then, is an essential part of the functioning of local police. It in fact occupies such a high proportion of police

time that one can even question "the value of viewing the police primarily as a part of the criminal justice system."

Livingston, 1998 U Chi Legal F at 272–73 (1998) (citations omitted).

"[R]esolving a noise dispute" is "one of the most common community caretaking tasks of local police." *Id.* at 311; *see also People v. Molnar,* 98 N.Y.2d 328, 746 N.Y.S.2d 673, 774 N.E.2d 738, 741 (2002) ("People sometimes create cooking odors or make noise to the point where neighbors complain."). The Supreme Court of Wisconsin has pointed out,

> [c]hecking noise complaints bears little in common with investigation of crime. As a general matter it is probably more a part of the "community caretaker" function of the police which, while perhaps lacking in some respects the urgency of criminal investigation, is nevertheless an important and essential part of the police role. A brief word from an officer, or in some cases his mere presence, often will put an end to disturbing behavior which otherwise might lead to serious breaches of the peace or worse.

*Bies v. State,* 76 Wis.2d 457, 251 N.W.2d 461, 468 (1977).

"Of course, sometimes community caretaking and law enforcement are intertwined," Livingston, 1998 U Chi Legal F at 261, or, at the very least, can "overlap." Michael R. Dimino, Sr., *Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness,* 66 Wash & Lee L.Rev. 1485, 1554 (2009). As this Court has commented:

> A note of caution is in order about our use of the term "non-investigatory capacity." When in the context of a possible burglary or breaking and entering, the police enter a home or other structure in order to come to the aid of a possibly injured or threatened owner or to protect the property of that owner, they are, in one sense of the term, quite obviously investigating the possibility that a crime has occurred. Their purpose *vis-a-vis* the burglar they may catch is, of course, "investigatory."

With respect, on the other hand, to the presumably innocent victims of possible crimes, where persons and/or property are in apparent danger, the police intervention is "non-investigatory" in its purpose and the constraints and hesitation that routinely inhibit a criminal investigation are inappropriate.

*Alexander,* 124 Md.App. at 277 n. 2, 721 A.2d 275 (citation omitted).

 In such situations,

[*Cady v.*] *Dombrowski's* definition of community caretaking as the performance of functions "totally divorced from [law enforcement]" might imply that police activity fulfilling both a community-caretaking purpose and a law enforcement one would not trigger the exception—neither purpose would be totally divorced from the other. In fact, however, the [Supreme] Court has treated such mixed-motive searches and seizures as community caretaking. In inventory-search cases, for example, the Court has stressed the community-caretaking purposes of securing valuables, guarding against false claims of theft, and protection of the police from dangerous items in the vehicle, but police are undoubtedly motivated at least in part by the possibility that such searches will yield evidence. Similarly, when considering the constitutionality of sobriety checkpoints, the Court has focused on the community-caretaking purpose of protecting potential victims of drunk driving, but the law-enforcement motivation of catching drunk drivers is manifest. Thus, in an ironic inversion of the language in [*Cady* ], the Court at times appears to apply the community-caretaking doctrine unless the police activity is totally divorced from the protection of the public.

Dimino, 66 Wash & Lee L.Rev. at 1492–93 (citing *People v. Ray,* 21 Cal.4th 464, 88 Cal.Rptr.2d 1, 981 P.2d 928, 931 (1999); *South Dakota v. Opperman,* 428 U.S. 364, 369, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *United States v. Roberson,* 897 F.2d 1092, 1096 (11th Cir.1990); *Mich. Dep't of State Police v. Sitz,*

496 U.S. 444, 451, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990)). As this Court stated,

> [e]ven when the person subjected to a Fourth Amendment intrusion is the actual target of the inquiry, if the purpose is not *per se* to discover evidence of crime but is intended to serve some "special need beyond the investigative norm," what is constitutionally required is simply general reasonableness or articulable suspicion.

*Alexander,* 124 Md.App. at 277–78, 721 A.2d 275.

Because of the not infrequent overlap between investigatory and non-investigatory police functions, courts "have validated many community caretaking intrusions . . . on the ground that they fall within variously formulated 'exigent circumstances,' 'emergency,' and 'rescue' exceptions" to the warrant requirement. Livingston, 1998 U Chi Legal F at 276 (citation omitted). Indeed, exigency in community caretaking cases is an "imp" that "bedevils much of Fourth Amendment jurisprudence," H. Richard Uviller, Virtual Justice 82 (Yale 1996), causing this Court to caution:

> Linguistic or analytic confusion may be avoided if it is carefully noted 1) that exigency is a factor in the emergency aid and protection cases that are part of the community caretaking function, *see, e.g., Oken v. State,* 327 Md. 628, 643–47, 612 A.2d 258 (1992); *Lebedun v. State,* 283 Md. 257, 259–78, 390 A.2d 64 (1978); *Davis v. State,* 236 Md. 389, 395–98, 204 A.2d 76 (1964); and 2) that exigency is also a factor that sometimes justifies warrantless activity in the course of a criminal investigation, *see, e.g., Wengert v. State,* 364 Md. 76, 84–86, 771 A.2d 389 (2001); *Carroll v. State,* 335 Md. 723, 728–39, 646 A.2d 376 (1994); *Stackhouse v. State,* 298 Md. 203, 468 A.2d 333 (1983); *Burks v. State,* 96 Md.App. 173, 195-98, 624 A.2d 1257 (1993). It may be (we do not here decide) that the measure of exigency is the same in both contexts. Notwithstanding their common use of the term "exigency," however, it would seem helpful to keep the two contexts scrupulously distinct. As Professor LaFave, op cit at § 6.6(a), p. 390 n. 5, noted:

> Though this "emergency aid exception" is one of many "community caretaking functions" of the police, it ... must be distinguished from "the exigent circumstance exception" ... for the former are only invoked when the police are not engaged in crime-solving activities.

*State v. Brooks,* 148 Md.App. 374, 383–84, 812 A.2d 342 (2002).

 The community caretaking exception "does not have a single meaning, but is rather an umbrella that encompasses at least three other doctrines: (1) the emergency-aid doctrine, (2) the automobile impoundment/inventory doctrine, and (3) the public servant exception." *Wilson v. State,* 409 Md. 415, 430, 975 A.2d 877 (2009) (footnote omitted). Regarding the public servant exception, the *Wilson* Court explained:

> The caretaking function has been recognized also as a general public welfare rule or what is sometimes known as the "public servant" exception. When the police act to protect the public in a manner outside their normal law enforcement function, many courts have applied the doctrine to validate many warrantless searches and seizures, and in a variety of circumstances. [*United States v. Garner,* 416 F.3d 1208 (10th Cir.2005)] (officer exercised community caretaking function when he told defendant to come back and sit down so that fire department could examine him); [*United States v. Miller,* 589 F.2d 1117 (1st Cir.1978)] (boarding an abandoned boat and finding evidence of narcotics trafficking was lawful under the community caretaking doctrine because the possible drowning of the boat owner was being investigated); *People v. Ray,* 21 Cal.4th 464, 88 Cal.Rptr.2d 1, 981 P.2d 928 (Cal.1999) (officers lawfully entered apartment in response to a call that it was in shambles and its door had been left ajar all day, to check on the welfare of the persons inside the apartment); *People v. Luedemann,* 222 Ill.2d 530, 857 N.E.2d 187, 306 Ill.Dec. 94 (Ill.2006) (officer exercised community caretaking function in checking on defendant, who appeared intoxicated and was seated in driver's seat of parked car at night); [*State v. Dube,* 655 A.2d 338 (Me.1995)] (initial entry of police into defendant's apartment to oversee custodian's plumbing re-

pair lawful as a community caretaking function); [*Common-wealth v. Waters*, 20 Va.App. 285, 456 S.E.2d 527 (1995) ] (officers' community caretaking functions include checking on well-being of individual in a public space who appears ill or in need of assistance); *State v. Kinzy*, 141 Wash.2d 373, 5 P.3d 668 (Wash.2000) (community caretaking function extends to officer approaching at risk youth in high narcotics trafficking areas to check on their safety).

\* \* \*

The "public safety" doctrine is based upon a recognition that law enforcement officers perform a myriad of functions and responsibilities, the enforcement of criminal laws being only one of them. *Williams v. State*, 962 A.2d 210, 216–17 (Del.2008); 3 WAYNE R. L[A]FAVE, SEARCH AND SEIZURE, § 5.4(C) (4th ed.2004). The Supreme Court of Delaware, in *Williams*, described the underpinnings of the doctrine as follows:

> "The modern police officer is a 'jack-of-all-emergencies,' with complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses; by default or design he [or she] is also expected to aid individuals who are in danger of physical harm, assist those who cannot care for themselves, and provide other services on an emergency basis...."

*Williams*, 962 A.2d at 216–17 (internal citations omitted).

As did the Delaware Supreme Court, as well as the majority of jurisdictions in the country, we find that the public welfare component of the community caretaking function of the police "encompasses a non-investigative, noncriminal role to ensure the safety and welfare of our citizens," reflecting that principle that the role of the police is not limited to the investigation, detection and prevention of crime in this State. *See id.* at 218; *see also State v. Lovegren*, 2002 MT 153, 310 Mont. 358, 51 P.3d 471, 475–76 (Mont.2002).

*Id.* at 435–36, 975 A.2d 877.

While there is a split among the courts regarding the application of the community caretaking doctrine outside the

automobile context,[12] and even confusion within the commentary as to the breakdown of that split,[13] the Court of Appeals has stated that

[t]he Supreme Court's recognition of a separation between investigatory and non-investigatory functions of the police underlies the application of the public servant exception [of the community caretaking doctrine] beyond the automobile impoundment/inventory search to justify initial encounters and intrusions in other circumstances.

*Wilson,* 409 Md. at 436, 975 A.2d 877. This Court has also applied the community caretaking doctrine to homes.

*State v. Alexander,* 124 Md.App. 258, 721 A.2d 275 (1998), involved "the lawfulness of the warrantless entry into a home pursuant to the community caretaking function." *Randall v. Peaco,* 175 Md.App. 320, 335, 927 A.2d 83 (2007). In that case, a man left an anonymous tip with the police on Thanksgiving day "that his next-door neighbor's basement door was open and that he believed that the neighbor was away." *Alexander,* 124 Md.App. at 262, 721 A.2d 275. Corporal Brian Koehn was ordered to respond to a "possible breaking and entering." *Id.* After arriving at the residence,

Corporal Koehn walked around the house and checked all doors and windows. He noticed that the basement door was "wide open," but observed no signs of a forcible entry. At that point, he advised Deputy Sheriff Ronald Naughton via radio that the residence had an open door and that he was going to await Deputy Naughton's arrival before attempting

---

12. *See, e.g.,* Mary Elisabeth Naumann, Note: *The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception,* 26 Am. J.Crim. L. 325, 326 (1999) ("A review of both federal and state case law reveals a lack of consistency in the definition and boundaries of the community caretaker doctrine....").

13. *Compare Ray v. Twp. of Warren,* 626 F.3d 170, 175–176 (3d Cir.2010) ("[T]he majority of the [federal courts of appeal] have reasoned that the community caretaking doctrine announced in *Cady* is limited to searches of automobiles") *with* Dimino, 66 Wash & Lee L.Rev. at 1442 n. 295 ("Most courts extend the community-caretaking doctrine to the home.").

to enter the residence. At the suppression hearing, he explained that he decided to wait for Naughton because he believed a breaking and entering was in progress and, for his own safety, he did not want to confront any potential burglars alone. When asked at the suppression hearing why he thought that a breaking and entering was in progress, he recited the following reasons: 1) he had been alerted to a possible breaking and entering by the original radio broadcast; 2) he had observed an open basement door; 3) he had been told the homeowners were away; 4) he observed no vehicles in the driveway; and 5) the house was in a residential area that had been the scene of a rash of recent breakings and enterings.

Deputy Naughton testified at the suppression hearing and confirmed Corporal Koehn's statement that that particular neighborhood had been the scene of many recent breakings and enterings. He further testified that the call he received in the instant case was similar to calls he had received in cases of other recent breakings and enterings and that it was unusual to see any signs of forcible entry into a residence other than an open door. While still waiting for his back-up, Corporal Koehn "hollered in the house if anybody is home, Sheriff's Office." He received no reply. He then walked around to the front of the house, knocked on the door and rang the doorbell. He heard a dog barking inside but otherwise received no reply.

Shortly thereafter, Deputy Naughton arrived at the scene and also observed the open basement door. The two officers then entered the house through that door and began a sweep of the residence to determine if anyone was inside. They first noticed that the basement was in disarray. While still searching for possible intruders, they opened the door of a walk-in closet in the master bedroom. They there observed marijuana on a shelf in plain view.

The officers left the narcotics untouched on the shelf while they completed their search for intruders. They then secured the house and obtained a search warrant based on their observation of the marijuana. They subsequently

executed the warrant and seized the marijuana, along with assorted drug paraphernalia and cash.

*Alexander,* 124 Md.App. at 263–64, 721 A.2d 275.

After examining the community caretaking doctrine, we held:

> the entry by two deputy sheriffs into 11541 Deadwood Drive at approximately 1 P.M. on November 27, 1997, was eminently reasonable.... It was reasonable for them to fear that a burglary had recently taken place and that evidence of it might be found inside. There was a reasonable possibility that a criminal intruder might still be inside the home.... Particularly in circumstances where there is no reason to be skeptical about the police exercise of their caretaking function because of any fear of subterfuge, the conduct of the two officers was exemplary. The [homeowners] were not in any way suspected of being involved in any crime. The officers, who came to the scene only to be of assistance, had reason for being apprehensive that the [homeowners'] home, the [homeowners'] personal property, and possibly even the [homeowners] themselves were in danger. Had the officers walked away from the scene, they would have been derelict in their duty.

*Id.* at 280–82, 721 A.2d 275.

In *State v. Brooks,* 148 Md.App. 374, 812 A.2d 342 (2002), after a 911 emergency center received a telephone call in which no one spoke, followed by a suspicious follow-up call by the Sheriff's Office to the residence in Harford County from which the 911 call had originated, Deputy Gregory Young was "dispatched to the scene to look 'for a possible fight, domestic fight.'" *Id.* at 385, 812 A.2d 342. He testified that he had been told that there had been a 911 "hang-up" call, followed by a follow-up call which revealed that there was a "very heated" situation inside the residence. *Id.*

> When he arrived,
> [a] young child was peacefully walking away from the house. Latonia Brooks was standing in the doorway. Although there was on her left cheek a trickle of blood compatible

with a "popped" pimple from her severe acne condition, she showed no signs of cuts or injuries. Her demeanor was calm and her appearance was neither rumpled nor disheveled. She told Deputy Young, moreover, that he was no longer needed.

*Id.* at 394, 812 A.2d 342. Nevertheless, Deputy Young "told Ms. Brooks that we needed to go inside to determine what was going on. She insisted that we not go inside. I told her, due to the nature of the incident, I had to go inside." *Id.* at 395–96, 812 A.2d 342. Over the protests of Ms. Brooks, Deputy Young

> stepped "just inside the doorway," into the living room area. It was there that he further debriefed [Ms. Brooks] and learned from her that the source of the earlier trouble had been her boyfriend, Charlton Anderson, and that the boyfriend was now gone. There was in the living room no broken or overturned furniture or other signs of a disturbance.

*Id.* at 404, 812 A.2d 342.

Responding to "[t]he State's theory of the case ... that Deputy Young entered [the residence] not in an investigatory capacity but in the execution of his community caretaking function, as he responded to a scene of possible domestic violence," *id.* at 381, 812 A.2d 342, we held that any exigency fears had subsided by the time Deputy Young arrived, but stated that, "[i]f, when Deputy Young arrived at 646 Harpark Court, no one was about and no one responded to his knock at the door, *it seems beyond dispute that he could have entered the premises warrantlessly.*" *Id.* at 385, 812 A.2d 342 (emphasis added).

Several cases outside of Maryland have addressed "concerns arising from a warrantless entry *to abate an ongoing nuisance.*" *United States v. Rohrig,* 98 F.3d 1506, 1520 (6th Cir.1996) (emphasis added). In *People v. Lanthier,* 5 Cal.3d 751, 97 Cal.Rptr. 297, 488 P.2d 625 (1971), Lanthier, a student at Stanford University, had been assigned a study carrel, *i.e.,* "a desk with attached bookcase and small locker," in the

school library. *Id.,* 97 Cal.Rptr. 297, 488 P.2d at 626. Riley, a maintenance employee, later

> received a complaint received a complaint of a noxious odor emanating from somewhere in the study hall. He was informed that "it smelled as if someone had vomited in the room," and it had been necessary to prop the doors open to air out the room throughout the previous day. That remedy had not cured the situation, however, and Riley was asked to check the room "and see if there was something causing the smell coming from the lockers."

*Id.* Using a master key, Riley began opening the carrel lockers to track down the source of the odor, which he discovered emanating from a briefcase in Lanthier's locker. When he opened the briefcase, he discovered 38 baggies of marijuana, and for which Lanthier was later arrested.

The court reasoned that, regardless of whether the university was a public or private institution, "the search here challenged would be reasonable within the meaning of the Fourth Amendment." *Id.,* 97 Cal.Rptr. 297, 488 P.2d at 627. Specifically,

> a "compelling urgency" was clearly shown. There had indeed been a "citizen complaint" about the malodorous smell permeating the entire study hall, and the smell was no less noticeable to Riley when he arrived to investigate. It was therefore reasonable for him to undertake, in his capacity of maintenance supervisor, a "prompt inspection" of the carrel area for the purpose of *discovering and abating* the nuisance. And inasmuch as the students entitled to use the room had already been disturbed by this offensive odor throughout the preceding day, further delay in suppressing it would have been unjustifiable.

*Id.,* 97 Cal.Rptr. 297, 488 P.2d at 628 (emphasis added)

In *State v. Dube,* 655 A.2d 338, 340 (Me.1995), the maintenance custodian of an apartment building and two police officers entered a tenant's apartment to stop water or sewage leaking into the apartments below. A state statute, 14 M.R.S.A. § 6025(2) (Supp.1993), provided that, "[e]xcept in the

case of an emergency or if it is impractical to do so, the landlord shall give the tenant reasonable notice of his intent to enter and shall enter only at reasonable times. Twenty-four hours is presumed to be reasonable notice in the absence of evidence to the contrary."

When they entered the apartment, the police found urine and feces strewn throughout the dwelling, and Dube was charged with endangering the welfare of a child. The court, in response to an assignment of a Fourth Amendment violation, and noting that "a police officer has a 'legitimate role as a public servant to assist those in distress and to maintain and foster public safety,'" *id.* at 340 (quoting *State v. Pinkham*, 565 A.2d 318, 319 (Me.1989)), and that "police officers frequently engage in 'community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute,'" *id.* (quoting *Pinkham*, 565 A.2d at 319), held that "the custodian had a statutory right to enter the apartment in response to an emergency[.]" *Id.*

In *United States v. Rohrig*, 98 F.3d 1506 (6th Cir.1996),

[i]n the early morning hours of May 22, 1994, Canton, Ohio, Police Officers John Clark and Walter Tucker received a complaint of loud noise emanating from the residence of [Rohrig]. As the officers approached within a block of [Rohrig's] home in their squad car, they began to hear loud music. Shortly after the officers arrived on the premises at 1:39 a.m., somewhere between four and eight pajama-clad neighbors emerged from their homes to complain about the noise.

... Officer Clark banged repeatedly on the front door of [Rohrig's] home, but received no response. While Officer Tucker returned to the squad car in an attempt to obtain the telephone number of the residence, Officer Clark walked around the outside of the two-story residence, all the while tapping to no avail on its first-floor windows. As he walked outside the house, he observed two stereo speakers in the first-floor living room and another pair of speakers in an

upstairs room, with speaker wire running between the two floors on the outside of the home.

Upon reaching the back door of [Rohrig's] home, Officer Clark discovered that it was open, with only an unlocked screen door preventing access into the house. He called to Officer Tucker, who abandoned his effort to obtain a telephone number and joined Officer Clark at the back door. The officers knocked and hollered to announce their presence, but again received no answer. They then opened the unlocked screen door, passed through a porch and through the open back door, and emerged into a kitchen. . . .

A light was on in the kitchen when the officers entered, but the remaining first-floor rooms were dark. The officers then observed another light emerging from an open doorway. Proceeding through this doorway toward the light, they traveled down some stairs and into [Rohrig's] basement. The officers testified that they went downstairs not because they believed that was the source of the loud music, but because they hoped to find an occupant of the home who could turn the music down. Upon reaching the basement, the officers discovered "wall-to-wall" marijuana plants, as well as fans and running water.

Having failed to locate anyone in the basement, the officers returned to the first floor, and then traveled upstairs to the second floor, continuing to announce their presence. At the top of the stairs, Officer Clark observed a man lying on the floor of one of the two bedrooms, and also discovered that this room contained the stereo that was the source of the loud music. As Officer Clark attempted to rouse the sleeping man, who turned out to be [Rohrig], Officer Tucker turned down the offending stereo.

*Id.* at 1509. Later, Rohrig signed a consent form, and a search revealed the marijuana and a sawed-off shotgun. Rohrig was cited for a noise violation, and also charged with federal offenses related to marijuana and the weapon.

Noting "that none of the traditionally recognized exigent circumstances is squarely presented under the facts of this

case," the court nonetheless held that "exigent circumstances justified the warrantless entry into [Rohrig's] home," *id.* at 1518, because there was "an ongoing and highly intrusive breach of the neighborhood's peace in the middle of the night." *Id.* at 1519.[14]

In its analysis, the Court noted

three important considerations in a typical "exigent circumstances" inquiry: (1) whether immediate government action was required, (2) whether the governmental interest was sufficiently compelling to justify a warrantless intrusion, and (3) whether the citizen's expectation of privacy was diminished in some way.

*Id.* at 1521. Regarding the first element, "[h]ad the officers attempted to secure a warrant, it is clear that the aural assault emanating from [Rohrig's] home would have continued unabated for a significant period of time." *Id.* Regarding the second and third elements,

by entering [Rohrig's] residence for the limited purpose of locating and abating a nuisance, the officers sought to restore the neighbors' peaceful enjoyment of their homes and neighborhood. In view of the importance of preserving our communities, we do not think that this interest is so insignificant that it can never serve as justification for a warrantless entry into a home.

*Id.* The *Rohrig* court stated that *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) "teaches that the weight of a governmental interest should be measured in part by the severity of the offense being investigated," but opined that "the *Welsh* analysis has less relevance as one moves away

---

14. The *Rohrig* court conflates exigent circumstances and community caretaking exceptions. *See Ray v. Twp. of Warren,* 626 F.3d 170, 176 (3d Cir.2010) (*Rohrig* applies "what appears to be a modified exigent circumstances test, with perhaps a lower threshold for exigency if the officer is acting in a community caretaking role."); John F. Decker, *Emergency Circumstances, Police Responses, and Fourth Amendment Restrictions,* 89 J.Crim. L. & Criminology 433, 454 (1999) (The Sixth Circuit "evidently views community caretaking functions, at least in some cases, as a form of exigent circumstances.").

from traditional law enforcement functions and toward ...
'community caretaking functions.'" *Rohrig,* 98 F.3d at 1521
(citations omitted).

Therefore,

the governmental interest in immediately abating an ongo-
ing nuisance by quelling loud and disruptive noise in a
residential neighborhood is sufficiently compelling to justify
warrantless intrusions under some circumstances.... In
particular, a compelling governmental interest supports
warrantless entries where, as here, strict adherence to the
warrant requirement would subject the community to a
continuing and noxious disturbance for an extended period
of time without serving any apparent purpose.

Moreover, as discussed earlier, [*Camara v. Municipal
Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)]
and its progeny instruct us to balance the governmental
interest being served against the individual's interest in
remaining free from governmental intrusions. In light of
[Rohrig's] course of conduct, we find that he cannot claim
the degree of privacy protection that generally attaches to
private dwellings. *See* [*Katz v. United States,* 389 U.S. 347,
351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)] ("The Fourth
Amendment protects people, not places. What a person
knowingly exposes to the public, even in his own home or
office, is not a subject of Fourth Amendment protection.").
Just as one's expectation of privacy diminishes as he ven-
tures beyond his doorway, *see* [*United States v. Santana,*
427 U.S. 38, 42, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976)],
[Rohrig] here undermined his right to be left alone by
projecting loud noises into the neighborhood in the wee
hours of the morning, thereby significantly disrupting his
neighbors' peace. Indeed, in this case, we cannot protect
[Rohrig's] interest in maintaining the privacy of his home
without diminishing his neighbors' interests in maintaining
the privacy of their homes. Accordingly, we find that the
governmental interest in preserving a peaceful community is
all the more compelling when balanced against [Rohrig's]

substantially weakened interest in maintaining the privacy of his home.

*Id.* at 1522.

"Having found that an important 'community caretaking' interest motivated the officers' entry in this case," the *Rohrig* court held that the officers' "failure to obtain a warrant does not render that entry unlawful." *Id.* at 1523. "Quite simply, we find nothing in the Fourth Amendment that leads us to disapprove of the officers' chosen course of action." *Id.* at 1525.[15]

In *People v. Molnar*, 98 N.Y.2d 328, 746 N.Y.S.2d 673, 774 N.E.2d 738 (2002),

> a 911 caller alerted police to a "strange odor" at [Molnar's] apartment building. Responding to the scene, the officers spoke to the complaining neighbor.... He told the officers that [Molnar's] apartment was just below his, and that he had to vacate his own apartment because the smell emanating from [Molnar's] apartment was unbearably putrid. The police confirmed that the "rotting" smell came from [Molnar's] apartment. Although the smell surely suggested it, the police could not have said with certainty that it was caused by a rotting body.

*Id.,* 746 N.Y.S.2d 673, 774 N.E.2d at 739. The police knocked on the door, but, receiving no answer, they had the door pried open. They discovered a decomposing corpse and Molnar was charged with murder. In upholding the search, the court stated:

> Before entering the apartment, the police encountered no evidence of any crime, and the circumstances did not lend

---

**15.** The court also made clear the scope of its holding:

> We wish to emphasize the fact-specific nature of this holding. By this decision, we do not mean to fashion a broad "nuisance abatement" exception to the general rule that warrantless entries into private homes are presumptively unreasonable. We simply find that, in some cases, it would serve no Fourth Amendment purpose to require that the police obtain a warrant before taking reasonable steps to abate an immediate, ongoing, and highly objectionable nuisance, and we conclude that this is just such a case.

*Id.* at 1525 n. 11.

themselves to criminal processes. The police were not functioning in a criminal arena, but acting as public servants in the name of protecting public health and safety. They proceeded with restraint and took the time to deliberate, using force only after exhausting other reasonable avenues.

*Id.*, 746 N.Y.S.2d 673, 774 N.E.2d at 742.

In *State v. Dorney*, 2005–Ohio–657, 2005 WL 388179 (2005), Officer Kim Griffin of the Riverside Police Department responded to a residence in Riverside on the report of a local party with underage drinking. Upon arriving at the residence, Officer Griffin observed approximately 50 cars parked bumper to bumper on both sides of the residential street. As she approached the residence where the loud noise was emanating she could smell alcohol and she observed several persons inside the residence who appeared to be underage.

*Id.* at ¶ 2. Officer Griffin entered the residence to attempt to find its owner, and, in doing so, cited several individuals for alcohol violations, including Dorney, the homeowner.

The Court of Appeals of Ohio held:

We find the holding in *U.S. v. Rohrig* to be persuasive. Officer Griffin entered the basement only after initial efforts at a loud crowded party to find the [homeowner] were unsuccessful.... The purpose of the police entering the ... residence was twofold; namely to abate the noise which prompted the police to be called in the first place and to determine if there was underage drinking going on inside the residence. [Dorney] quite clearly undermined his right to be left alone by the police by projecting loud noises into the neighborhood. It was not reasonable to expect the police to obtain a search warrant under these circumstances.

*Id.* at ¶ 21.

In *State v. Kaltner*, 420 N.J.Super. 524, 22 A.3d 77 (2011), police responded to a noise complaint in the early hours of October 23, 2009. A large party was occurring at the residence, and the officers knocked on the door. "Within a minute, an unidentified male opened the door to allow the

officers entry, but walked away before the officers could speak with him." *Id.* at 530, 22 A.3d 77. The officers entered, and observed people drinking and talking loudly. The officers then "canvassed the residence" in order to "identify and locate the residents in order to clear out the party, abate the noise and ensure that no individual was in need of medical assistance, even though there were no reports of anyone in need of assistance or in physical distress." *Id.* One officer proceeded to the second and third floors. On the third floor, this officer "peered" into Kaltner's bedroom, where he observed and seized ecstasy pills.

The Appellate Division of the Superior Court of New Jersey stated that "under certain circumstances, a defendant who knowingly exposes one's home to the public has a 'lessened expectation of privacy,'" *id.* at 534, 22 A.3d 77 (quoting *State v. Henry*, 133 N.J. 104, 117, 627 A.2d 125 (1993)), but held:

> Governed . . . by the reasonableness standard, and weighing all of its component competing interests, we conclude that the police action in this instance was not constitutionally permitted. Although police entry into the dwelling was initially justified [by consent], their subsequent action in fanning out and conducting, in essence, a full-blown search of the home was neither reasonably related in scope to the circumstances that justified the entry in the first place nor carried out in a manner consistent with the factors supporting the entry's initial legitimacy. Indeed, unlike *Rohrig*, the objective of noise abatement could have been achieved well short of the full-scale search engaged in by the officers in this matter.
>
> . . . Unlike *Rohrig*, where the sole occupant in the home was sleeping and thus the police were unable to locate the source of the loud music and turn down the volume, here the offending noise emanated from the crowd itself, which the police could easily have dispersed or otherwise brought under control given the number of officers present.

*Id.* at 544–45, 22 A.3d 77.

In the case now before us, the police had probable cause to believe that appellant had committed and was intend-

ing to commit the crime of disturbing the peace, which, as defined by § 10–201(c)(5)(i) of the Criminal Law Article, states that "[a] person from any location may not, by making an unreasonably loud noise, willfully disturb the peace of another ... on the other's land or premises[.]" But this does not end our inquiry, for probable cause alone does not support a warrantless entry. *See Payton v. New York*, 445 U.S. 573, 587–88, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Rather, in this context we must determine whether the subsequent entry and appellant's arrest were "reasonable" under the circumstances.

In denying appellant's motion for judgment of acquittal, the trial court found that, after spending more than an hour trying various ways to reason with appellant and moderate the noise, the police "made a reasonable decision ... to use the minimal amount of force and damage necessary to abate this nuisance," which was occurring "within earshot" of neighbors in a "densely packed residential area." According to the court, the police could have sought a warrant, but "it's reasonable to assume that another significant amount of time would go by."

According to the testimony of various police officers, when the decision was made to enter appellant's apartment without consent and to arrest appellant, they were functioning with both a caretaking (abate the nuisance) and investigatory (arrest appellant) purpose. As to "What came first?," the decision to enter and arrest appellant came only after an extended but unsuccessful effort to abate the noise and diffuse the situation. In light of these dual purposes and guided by the previous discussion, we will analyze the entry and arrest under the more traditional exigent circumstances exception and the community caretaking exception. In consideration of the former, we will address the right to enter and arrest where a crime is committed in the presence of a police officer.

While the Court of Appeals has cautioned that, in the case of traditional law enforcement functions, "the exigent circumstances [exception] is to be construed narrowly," *Stackhouse v. State*, 298 Md. 203, 215–16, 468 A.2d 333 (1983), it may be—but we need not decide—that the circumstances here qualify

as "exigent" and would justify the forceful entry into appellant's apartment if the sole purpose of the entry was to arrest him based on a crime that was being committed in the officers' presence.

In the more traditional view of exigent circumstances, the facts of this case do not present a situation where life [16] or property was at risk, evidence was being compromised or destroyed, or appellant was fleeing, or in a position to flee, to avoid arrest while a warrant was obtained. *See, e.g., Brigham City v. Stuart,* 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) (Exigent circumstances include when there is an imminent risk of death or serious injury, or danger that evidence will be immediately destroyed, or that a suspect will escape). But the "endanger[ing]" of "the peace and good order of the community" may also create exigent circumstances, *McDonald v. United States,* 335 U.S. 451, 459, 69 S.Ct. 191, 93 L.Ed. 153 (1948) (Jackson, J., concurring), and the Court of Appeals has recognized that, in some cases, "the mere observation of a crime may provide its own exigency" when the police, as they did here, "observe the perpetrator actively so engaged" in the commission of that crime. *Dunnuck v. State,* 367 Md. 198, 217, 786 A.2d 695 (2001).[17]

That said, considering the totality of the circumstances surrounding the entry into appellant's apartment, we are persuaded that the officers' actions were reasonable under the community caretaking doctrine.[18] In reaching this conclu-

---

16. We recognize that the police believed appellant to be armed, a "consideration [which] bears materially on the justification for a warrantless entry." *Dorman v. United States,* 435 F.2d 385, 392 (D.C.Cir. 1970).

17. "[A] crime is considered as being committed in the presence or view of an officer when any of his senses," including those of sight, smell and sound, "afford him knowledge that it is being committed." *Griffin v. State,* 200 Md. 569, 575, 92 A.2d 743 (1952) (citing *Bass v. State,* 182 Md. 496, 505, 35 A.2d 155 (1943)).

18. Judge Moylan, writing for this Court, has stated, "[i]t is clear that the standard for assessing the Fourth Amendment propriety of [commu-

sion, we assign great weight to the late hour of appellant's activities in a "densely packed residential" neighborhood, and the extensive efforts taken by the officers to reason with appellant to abate the noise without any need to formally enter the apartment. We recognize that this "nighttime intrusion" was a "severe invasion of privacy," *Jones v. United States*, 357 U.S. 493, 498, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958), and any entry "of a residence at night is of an order of magnitude greater than that" resulting from a daytime search or seizure. *Gooding v. United States*, 416 U.S. 430, 463, 94 S.Ct. 1780, 40 L.Ed.2d 250 (1974). On the other hand, we recognize that community caretaking actions are intended "to assist the general public or a specific person or persons other than the one whose rights are implicated by the search or seizure." Michael R. Dimino, Sr., *Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness*, 66 Wash & Lee L.Rev. 1485, 1541 (2009).

Although his Fourth Amendment rights would ordinarily be at their zenith when he is home at night, appellant "undermined" his right to privacy "by projecting loud noises into the neighborhood in the wee hours of the morning, thereby significantly disrupting his neighbors' peace." *United States v. Rohrig*, 98 F.3d 1506, 1521 (6th Cir.1996). *See also State v. Kaltner*, 420 N.J.Super. 524, 534, 22 A.3d 77 (2011) ("under

---

nity caretaking] conduct is whether [the police] possessed a reasonable basis for doing what they did." *State v. Alexander*, 124 Md.App. 258, 277, 721 A.2d 275 (1998). In doing so,

> [a]n objective standard as to the reasonableness of the officer's belief must be applied. Thus, the question is whether there were reasonable grounds to believe that some kind of an emergency existed, that is, whether there is evidence which would lead a prudent and reasonable official to see a need to act. The officer must be able to point to specific and articulable facts which, taken with rational inferences from those facts, reasonably warrant that intrusion.

*Id.* (internal quotation marks omitted). Nevertheless, "[t]he caretaking function of the police must always be balanced with the rights and protections enjoyed by our citizens under the United States Constitution and the Maryland Declaration of Rights." *Wilson v. State*, 409 Md. 415, 437, 975 A.2d 877 (2009).

certain circumstances, a defendant who knowingly exposes one's home to the public has a 'lessened expectation of privacy' ") (quoting *State v. Henry*, 133 N.J. 104, 117, 627 A.2d 125 (1993)); *Commonwealth v. Orlando*, 371 Mass. 732, 735, 359 N.E.2d 310 (1977) ("[A]busive language [which] in some circumstances may constitute protected speech . . . may be constitutionally proscribed when loudly uttered late at night in a residential neighborhood so that people in the privacy of their homes are unable to avoid the noise."). Through his own actions, appellant made it impossible to protect his privacy interests "without diminishing his neighbors' interests in maintaining the privacy of *their* homes." *Rohrig*, 98 F.3d at 1522. Here, "preserving a peaceful community is all the more compelling when balanced against [appellant's] substantially weakened interest in maintaining the privacy of his home." *Id.*

To be sure, it would have been appropriate, and perhaps feasible, for the police to have obtained a warrant soon after they first arrived on the scene in light of appellant's behavioral history and his expressed intent to continue projecting his music through the night. But appellant should not be rewarded—and the neighborhood penalized—for the extended period of police patience and restraint. *See* 3 Wayne R. LaFave, A Treatise on the Fourth Amendment, § 5.1(b), p. 18 (4th ed. 2004) ("Warrantless arrests have been upheld even when it appeared that there was ample time to obtain an arrest warrant beforehand."); *Trupiano v. United States*, 334 U.S. 699, 705, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948) ("The absence of a warrant of arrest, even though there was sufficient time to obtain one, does not [necessarily] destroy the validity of an arrest[.]"). It was, in our view, reasonable not to wait another hour or more before entering the apartment to abate the noise and, in doing so, to arrest appellant, because cessation of the noise could not be ensured if appellant remained in his apartment.

In sum, we hold that the entry into appellant's apartment and his warrantless arrest were lawful, and that the evidence was sufficient to support appellant's conviction for resisting

that arrest. In doing so, we recognize that not every noise complaint should be reacted to "by breaking down the door." *People v. Molnar*, 98 N.Y.2d 328, 746 N.Y.S.2d 673, 774 N.E.2d 738, 741 (2002). Instead, each would have to be judged on the totality of the circumstances presented. Here, it was an ongoing late-at-night assault on the peace and good order of the community that excused the warrant requirement and permitted a forceful entry into the apartment to abate the disturbance that brought the police to the scene.

### *Jury Instruction*

 "The court shall give instructions to the jury at the conclusion of all the evidence and before closing arguments." Md. Rule 4–325(a). "The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding." *Id.* 4–325(c).

 Normally, a complaining party must "object[ ] on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection." *Id.* 4–325(e). "An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, *despite a failure to object.*" *Id.* (emphasis added). In *State v. Rich*, 415 Md. 567, 3 A.3d 1210 (2010), the Court of Appeals explained:

> "plain-error review"—involves four steps, or prongs. First, there must be an error or defect—some sort of "[d]eviation from a legal rule"—that has not been intentionally relinquished or abandoned, *i.e.*, affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it "affected the outcome of the [trial] court proceedings." Fourth and finally, if the above three prongs are satisfied, the [appellate court] has the discretion to remedy the error—discretion which ought to be exercised only if the error " 'seriously affect[s] the fairness, integrity or public

reputation of judicial proceedings.' " Meeting all four prongs is difficult, "as it should be."

*Id.* at 578, 3 A.3d 1210 (quoting *Puckett v. United States,* 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009)) (internal citations omitted). *See also Yates v. State,* 202 Md.App. 700, 721, 33 A.3d 1071 (2011), *aff'd* 429 Md. 112, 55 A.3d 25 (2012); *Dionas v. State,* 199 Md.App. 483, 536–37, 23 A.3d 277, *cert. granted* 422 Md. 352, 30 A.3d 193 (2011).

Plain error "review is reserved for those errors that are 'compelling, extraordinary, exceptional or fundamental to assure the defendant of [a] fair trial.'" *Robinson v. State,* 410 Md. 91, 111, 976 A.2d 1072 (2009) (quoting *Rubin v. State,* 325 Md. 552, 588, 602 A.2d 677 (1992)). Thus, "the 'plain error doctrine' 1) always has been, 2) still is, and 3) will continue to be a rare, rare phenomenon," *Morris v. State,* 153 Md.App. 480, 507, 837 A.2d 248 (2003), to be reserved for "blockbuster errors." *Martin v. State,* 165 Md.App. 189, 196, 885 A.2d 339 (2005) (quoting *United States v. Moran,* 393 F.3d 1, 13 (1st Cir.2004)).

Here, the court instructed the jury:

In order to convict [appellant] of resisting arrest, the State must prove that [appellant] was arrested; that the arrest was lawful; that [appellant] refused to submit to that arrest.

Acknowledging that no objection was made to the instruction, appellant argues that this instruction, which, unlike Maryland Criminal Pattern Jury Instructions 4:27.1 ("Resisting Arrest (Warrantless)"),[19] did not include "and resisted the arrest *by*

---

**19.** Maryland Criminal Pattern Jury Instructions 4:27.1 states:

The defendant is charged with the crime of resisting arrest. In order to convict the defendant of resisting arrest, the State must prove: (1) that a law enforcement officer attempted to arrest the defendant; (2) that the defendant knew that a law enforcement officer was attempting to arrest [him][her]; (3) that the officer had reasonable grounds to believe that the defendant [was committing] [had committed] (crime); and (4) that the defendant refused to submit to the arrest and resisted the arrest by force.

*force,"* merits plain error review. More specifically, he contends that this omission

> permitted the jury to convict [appellant] of resisting arrest without finding that he exerted any force when the police entered the apartment and tasered him. The omission permitted the jury to convict [appellant] of resisting arrest simply by finding that he did not submit to the police efforts to restrain him.
>
> \* \* \*
>
> The instruction thus was quite material to [appellant's] right to a fair and impartial trial and should be addressed on appeal as plain error.

The State counters that appellant "affirmatively waived" the opportunity for plain error review because he "expressly informed the trial court that he [had] no 'objections' to the instruction or 'additional requests,'" but that, even if plain error review were available, it "is unwarranted because the error did not affect the outcome of the trial."

 "[T]he plain error hurdle, high in all events, nowhere looms larger than in the context of alleged instructional errors." *Id.* at 198, 885 A.2d 339 (quoting *United States v. Sabetta,* 373 F.3d 75, 80 (1st Cir.2004)) (emphasis removed). Maryland's appellate courts, however,

> have often recognized error in the trial judge's instructions, even when there has been no objection, if the error was likely to unduly influence the jury and thereby deprive the defendant of a fair trial. The premise for such appellate action is that a jury is able to follow the court's instructions when articulated fairly and impartially. It follows, therefore, that when the instructions are lacking in some vital detail or convey some prejudicial or confusing message, however inadvertently, the ability of the jury to discharge its duty of returning a true verdict based on the evidence is impaired. The responsibility for avoiding such circumstance rests with the trial judge who must advise the jury on every

matter stemming from the evidence which is vital to its determination of the issues before them.

*State v. Hutchinson*, 287 Md. 198, 205, 411 A.2d 1035 (1980).

Our courts have found plain error when an element is omitted in a jury instruction. *See Franklin v. State*, 319 Md. 116, 571 A.2d 1208 (1990) (taking cognizance of plain error in an instruction indicating that specific intent to kill was not required to establish assault with intent to murder); *Dawkins v. State*, 313 Md. 638, 547 A.2d 1041 (1988) (finding plain error where jury instruction omitted element of knowledge from CDS possession).

 "Forfeited rights are reviewable for plain error, while waived rights are not." *State v. Rich*, 415 Md. 567, 580, 3 A.3d 1210 (2010) (quoting *United States v. Perez*, 116 F.3d 840, 845 (9th Cir.1997)) (emphasis removed). "Forfeiture is the failure to make a timely assertion of a right, whereas waiver is the 'intentional relinquishment or abandonment of a known right.'" *Id.* (quoting *Perez*, 116 F.3d at 845). Under the "invited error" doctrine, which is a "shorthand term for the concept that a defendant who himself invites or creates error cannot obtain a benefit—mistrial or reversal—from that error," *id.* at 575, 3 A.3d 1210 (quoting *Klauenberg v. State*, 355 Md. 528, 544, 735 A.2d 1061 (1999)), "[i]f the defendant has both invited the error, and relinquished a known right, then the error is waived and therefore unreviewable." *Id.* at 580, 3 A.3d 1210 (quoting *Perez*, 116 F.3d at 845).

In *Rich*, noting that the invited error doctrine "is applicable to appellate review of jury instructions specifically requested by the criminal defendant's counsel," *id.* at 575, 3 A.3d 1210 (citations omitted), and that "[a] party may not request an instruction and later complain on appeal that the requested instruction was given," *id.* (quoting *State v. Studd*, 137 Wash.2d 533, 546, 973 P.2d 1049 (1999)), the Court of Appeals held:

> when [Rich's] trial counsel (1) argued that the issue of voluntary manslaughter was generated by the evidence, and (2) made a specific request for a voluntary manslaughter

instruction, that action constituted an intentional waiver of the right to argue on appeal that the evidence was insufficient to support the voluntary manslaughter conviction. *Id.* at 581, 3 A.3d 1210. Here, appellant requested the following instruction for the charge of resisting arrest:

In order to convict [appellant] of Resisting Arrest, the State must prove:

(1) that [appellant] was arrested;

(2) that the arrest was lawful; and

(3) that [appellant] refused to submit to that arrest.

This requested instruction was identical to that actually given by the court in that neither instructed that, if convicted, the defendant must "resist the arrest *by force.*" We hold that the invited error doctrine applies here and that appellant cannot now obtain a benefit from that error.

*Keeping a Disorderly House*

*Sufficiency of the Evidence*

Section 10–202 of the Criminal Law Article ("Keeping a disorderly house—Penalty") states: "A person who keeps a disorderly house is guilty of a misdemeanor and on conviction is subject to imprisonment not less than 10 days and not exceeding 6 months or a fine not less than $50 and not exceeding $300 or both." Although the punishment is fixed by statute, keeping a disorderly house remains a common law crime. *Ward v. State,* 9 Md.App. 583, 585–86, 267 A.2d 255 (1970). Thus a "disorderly house is a nuisance, habitually kept" which draws together "dissolute persons engaged in unlawful and injurious practices, thereby [to] endanger the public peace and corrupt good morals." *Id.* at 586–87, 267 A.2d 255 (citations omitted). More specifically,

[t]he offence is that of a common nuisance, and it is necessary that the indictment should contain facts to show that a common nuisance has been created or permitted. This is done by allegation of such facts as show that the traverser maintains, promotes, or continues, what is noisome and

offensive, or annoying and vexatious, or plainly hurtful to the public, or is a public outrage against common decency or common morality, or which tends plainly and directly to the corruption of the morals, honesty, and good habits of the people; the same being without authority or justification of law.

* * *

 The crime consists in the keeping of the house as a place of habitual or common resort of people of evil name and fame, and of dishonest conversation, there to consort together; thus affording opportunities for and temptations to the indulgence of their bad habits and passions, to the evil example and scandal of the neighborhood.

*Beard v. State,* 71 Md. 275, 276, 282, 17 A. 1044 (1889). A disorderly house includes a house of gambling, *Curley v. State,* 215 Md. 382, 137 A.2d 640 (1958), a house of prostitution, *Whitaker v. Prince George's County,* 307 Md. 368, 514 A.2d 4 (1986), and a place where people assemble to engage in drug use. *Ward,* 9 Md.App. 583, 267 A.2d 255.

 Appellant contends that noise alone is not sufficient to support a conviction for keeping a disorderly house, and that keeping a disorderly house cannot be predicated on the habitual conduct of *one person*. The State responds that noise alone can be sufficient, but agrees that "a disorderly house is one used by *the public* to engage in the nuisance." (Emphasis added).

In *Tucker v. State,* 19 Md.App. 39, 308 A.2d 696 (1973), we held that, by enacting a statute criminalizing the maintenance of a common nuisance in the form of a drug house, the General Assembly did not intend to abandon the common law requirement that the disorderly house "be kept 'open for the public for licentious commerce.'" *Id.* at 47, 308 A.2d 696 (quoting *Lutz v. State,* 167 Md. 12, 16, 172 A. 354 (1934)). The Court reasoned:

> We can find no evidence that in the enactment of [the statute], the legislature intended to alter the nature of a common nuisance as a place where acts occur which do or

can involve people other than the person maintaining the premises in illegal activities. We therefore find that a drug addict who uses premises which he himself occupies as a residence, to store and conceal drugs for his own exclusive use, and does not use those premises to store or conceal drugs used or to be used by others, is not guilty of maintaining a common nuisance.

*Id.* at 48, 308 A.2d 696. Similarly, David E. Aaronson, *Maryland Criminal Jury Instructions and Commentary,* § 7.15 (3rd ed.2009), states that "[i]t is not sufficient for the defendant alone to frequent the premises for the purpose of engaging in unlawful conduct."

▮ We agree that a conviction for keeping a disorderly house cannot be based on the conduct of one person, and we shall vacate both of appellant's convictions for that offense.

### Jury Instruction

Appellant also argues that, "in light of the above cited cases," such as *Ward* and *Beard,* defining keeping a disorderly house, the "instruction was woefully inadequate and actually misleading and in error." Because we hold appellant's convictions for keeping a disorderly house to be legally insufficient, there is no need for us to address this additional assignment of error.

**JUDGEMENT AFFIRMED IN PART AND REVERSED IN PART. SENTENCES FOR KEEPING A DISORDERLY HOUSE VACATED AND CASE REMANDED. COSTS TO BE PAID HALF BY APPELLANT AND HALF BY WASHINGTON COUNTY.**